NOTICE
Decision filed 10/31/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250476-U

NO. 5-25-0476

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ZECHARIAH G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-40 |
| | ) | |
| Theresa C., | ) | Honorable |
| | ) | Martin W. Siemer, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Sholar and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where a voluntary acknowledgment of paternity was properly and successfully challenged, and no argument to the contrary would have merit, this court grants appellate counsel leave to withdraw and affirms the circuit court's order granting a petition to declare the nonexistence of a parent-child relationship.

¶ 2    This Fayette County neglect case comes before this court for the second time. In the first appeal, this court affirmed the circuit court's order of adjudication of neglect. Now, in the instant appeal, the respondent-mother, Theresa C. (Theresa), appeals from the circuit court's order that granted a petition to declare the nonexistence of a parent-child relationship between John R. and Theresa's minor son, Zechariah G. (Zechariah). Theresa's appointed counsel on appeal has concluded that this appeal lacks arguable merit and, on that basis, has filed a motion to withdraw

1

as counsel, along with a supporting brief. See *Anders v. California*, 386 U.S. 738 (1967). Counsel properly served Theresa. This court gave her an opportunity to file a *pro se* written response to the *Anders* motion, but she has not filed a response. Having read counsel's *Anders* motion and brief, and the entire record on appeal, this court grants counsel's motion and affirms the order of the circuit court.

¶ 3                                   I. BACKGROUND

¶ 4      Theresa is the mother of Zechariah (born May 2016), Gabriel G., Athena A., and Johnathan R. The four minors were the subjects of neglect proceedings in four separate cases—Fayette County case Nos. 22-JA-40, 22-JA-41, 22-JA-42, and 22-JA-43, respectively. Although the circuit court handled all four cases together, it never formally consolidated them. This appeal is in Zechariah's case only, so the facts will focus on Zechariah.

¶ 5      On July 11, 2022, the State filed a petition for adjudication of wardship alleging that Zechariah was neglected due to an environment injurious to his welfare. See 705 ILCS 405/2-3(1)(b) (West 2022). Theresa was named as Zechariah's mother; his father was alleged to be unknown. On July 12, 2022, the circuit court held a temporary-custody hearing, also known as a shelter-care hearing, and awarded temporary custody of Zechariah to the Department of Children and Family Services (DCFS) guardianship administrator.

¶ 6      On August 25, 2022, the circuit court called the case for a first appearance with counsel. Theresa was present with appointed counsel. John R., who was the biological father of Johnathan R. (case No. 22-JA-43), was present, and with his own appointed counsel. The DCFS case manager stated that DNA testing was needed to determine whether John R. was the father of Zechariah. Also on August 25, 2022, the court entered a written order stating that John R. "shall submit to

2

DNA testing by [DCFS] to determine if he is the biological father of the aforementioned child [*i.e.*, of Zechariah]."

¶ 7    On January 5, 2023, the circuit court called the cases of Zechariah and the three other minors for an adjudicatory hearing. The guardian *ad litem* (GAL) for Zechariah and the three other minors informed the court that the DCFS caseworker told her that John R., after the start of these neglect proceedings, had signed a voluntary acknowledgement of paternity (VAP) regarding Zechariah. The adjudicatory hearing was postponed.

¶ 8    On March 9, 2023, before the circuit court, the GAL for Zechariah and the three other minors stated that she intended to file a petition to declare the nonexistence of a parent-child relationship. She explained that she felt compelled to do so because Zechariah's birth certificate did not list a father, and John R. did not file a VAP regarding Zechariah until August 8, 2022, six years after Zechariah's birth and only after neglect proceedings had been initiated. The GAL stated that the VAP was "only a presumption of parentage" and that "due to how late this [VAP] is, I have concerns that it was not done in good faith, but *** in an attempt to prevent another father from being established." In response to the GAL's comments, John R. stated, through his attorney, that his VAP regarding Zechariah had obviated the need for DNA testing.

¶ 9    On March 10, 2023, the GAL for Zechariah and the three other minors filed the petition that is the subject of the instant appeal—a verified petition to declare the nonexistence of a parent-child relationship between John R. and Zechariah. The petition noted that Zechariah was born in May 2016, but that John R. did not file a VAP for Zechariah until August 8, 2022. The petition stated that the VAP was filed with the Illinois Department of Healthcare and Family Services (HFS) "well after [Zechariah's] birth and after the start of these proceedings." The petition sought to "invalidate or rescind" the VAP.

¶ 10    Two exhibits were attached to the GAL's petition: (1) a copy of Zechariah's birth certificate, which listed Theresa as his mother but did not list anyone as the father, and (2) a VAP regarding Zechariah, signed under penalty of perjury by John R., as father, and Theresa, as mother, on August 8, 2022, in the presence of a witness, and filed with HFS that same day.

¶ 11    On the VAP, Mark G. was named as the "presumed" father of Zechariah. At the time of Zechariah's birth, Mark G. was married to Theresa. However, during the pendency of their dissolution-of-marriage proceeding, Mark G. signed a written denial of parentage, and his denial was reflected in the judgment of dissolution, which the circuit court entered in 2021. Furthermore, during the instant neglect proceedings, on November 10, 2022, Mark G. testified that "it's been proven by DNA" that Zechariah was not Mark G.'s biological child. Because Mark G. was not the biological father of Zechariah or any of the other minors, the circuit court removed him as a party in this case.

¶ 12    On March 23, 2023, the circuit court granted the State leave to file an amended petition for an adjudication of wardship, one that named John R. as the father of Zechariah, in light of John R.'s filing a VAP for Zechariah. On March 29, 2023, the State filed an amended petition for adjudication of wardship. The amended petition remained the same as the original petition, except that the amended petition named John R. as Zechariah's father.

¶ 13    On April 6, 2023, at a first appearance on that amended petition for adjudication of wardship, the State represented to the circuit court that John R. was scheduled for a paternity test on April 18, 2023. The GAL for Zechariah and the three other minors opined that the court needed to "deal with" the VAP signed by John R. regarding Zechariah before it could proceed with the adjudicatory hearing. The adjudicatory hearing was postponed.

¶ 14    On May 4, 2023, at a scheduled status hearing, a case manager for Caritas Family Solutions (Caritas) represented to the circuit court that John R. had submitted to DNA testing, but the results of that testing had not yet been received.

¶ 15    On June 1, 2023, the circuit court held a status hearing. The GAL for Zechariah and the other minors represented to the court that she had received an email with John R.'s DNA test results. The GAL stated that she did not know why the results were not filed with the court but would ensure they were filed. Upon inquiry by the court, the GAL also represented to the court that the results showed a zero percent probability that John R. was Zechariah's father. This court notes that despite the GAL's assurances to the court, the DNA results, apparently, were never filed with the court.

¶ 16    On July 6, 2023, and on July 13, 2023, the circuit court finally held an adjudicatory hearing in Zechariah's case and in the three other minors' cases. The court found that the State had met its burden of proving that Zechariah and the others were neglected due to living in an environment injurious to their welfare. The court entered a written order of adjudication. On September 7, 2023, the circuit court held a dispositional hearing. At the end of that hearing, the court closed the case of Gabriel G. (case No. 22-JA-41) after finding that his father, Michael W., was willing, fit, and able to parent him. However, the court adjudged Zechariah and two of the other minors wards of the court, granting custody and guardianship to DCFS.

¶ 17    Theresa appealed from the order of adjudication. This court consolidated the four cases and concluded, *inter alia*, that the circuit court's finding that the minors had been neglected was not against the manifest weight of the evidence. This court affirmed the adjudication order. *In re Zechariah G.*, 2024 IL App (5th) 230768-U.

5

¶ 18    On May 30, 2024, the circuit court called for a hearing on the GAL's petition to declare the nonexistence of a parent-child relationship between John R. and Zechariah. That petition had been filed on March 10, 2023.

¶ 19    The GAL called, as her sole witness, Gretchen Truax of Caritas. Truax supervised other Caritas caseworkers and handled a few cases, such as this one, on her own. According to Truax, during the initial integrated assessment in this case, Theresa did not mention John R. as a possible father of Zechariah. During the first few months of this case, Caritas obtained Zechariah's birth certificate, and no father was named. During the autumn of 2023, after Theresa told Truax that the birth certificate had been revised, Truax obtained a copy. The revised birth certificate had John R.'s name added as the father of Zechariah. Although Truax did not recall seeing the VAP that was prepared in this case, when she was shown a copy of it during the hearing, she thought it seemed like the standard VAP that is used in Illinois. The VAP bore the signatures of John R. and Theresa, dated August 8, 2022; at the top of the document was an indication that the document had been filed with HFS on August 8, 2022, which was after the instant neglect proceeding had begun.

¶ 20    Truax recalled that after May 2023, Theresa and John R. were "fairly upset" that John R.'s paternity test had shown that he was not the father of Zechariah. In discussion with Theresa and John R., Truax always made clear her agency's obligation to identify children's parents properly, and Theresa stated that "their relationship" began in 2019, well after Zechariah's birth or conception. "[W]hen we discussed further," Theresa never went "so far" as to say that they knew John R. was not the father. Theresa and John R. did state, however, that John R. had promised to provide for Zechariah and wanted to be his father, and that this was the reason, "in essence," that Theresa and John R. had signed the VAP.

6

¶ 21    On cross-examination by John R.'s attorney, Truax stated that John R. has been a positive factor in Zechariah's life. During the GAL's redirect examination, Truax testified that during the initial integrated assessment in this case, Theresa did not disclose anyone except Mark G. as a possible father for Zechariah. Theresa had not named any other possible fathers for Zechariah. Even after the DNA test showed that John R. was not Zechariah's father, Theresa did not name any other possible fathers.

¶ 22    John R. testified on his own behalf that he was Zechariah's "father." He met Theresa in February 2007 when he was married to someone else, though separated. In April or May 2007, he and Theresa engaged in sexual relations, and their sexual relationship continued, off and on, up to the date of the hearing. When Theresa became pregnant with Zechariah, they were engaged in a sexual relationship. After the presumed father, Mark G., was declared not to be the father, John R. believed that he himself was the father. Immediately after that declaration, John R. and Theresa signed the VAP, though it was "lost" at the office of vital records. Nobody had forced John R. to sign the VAP, and Theresa had not made any false statements to persuade him to sign. When John R. went for DNA testing, he thought the test was solely for Johnathan R., who is truly his biological child with Theresa. He was not anticipating a DNA test regarding Zechariah. John R. described how he cared for Zechariah—*e.g.*, cooking, cleaning, taking him to the park—and said that Zechariah calls him "Papa John." According to John R., no one else has acknowledged Zechariah as his son or offered any support.

¶ 23    On cross-examination by the GAL, John R. stated that he did not want to do DNA testing for Zechariah; it was done without his permission. On redirect examination by his own attorney, John R. testified that he objected to DNA testing because he considered Zechariah and all the other minors to be his children, and DNA testing was therefore not needed.

7

¶ 24 Theresa testified on her own behalf. She stated that John R. was "the love of [her] life," though they were "[n]ot yet" married. She and John R. met and had sexual relations for the first time in 2007. Their sexual relationship continued, off and on, for years, and they were in a sexual relationship around the time Zechariah was conceived. Theresa recalled that she and John R. had signed a VAP. They actually had signed a few of them "over the years," but Mark G. kept tampering with the system, and the paperwork was not getting through right. At the time they signed the VAP mentioned at the hearing, Theresa and John R. believed that John R. was Zechariah's biological father. "In fact," said Theresa, "I still believe it because no one's produced me [*sic*] any evidence to say otherwise." According to Theresa, John R. had treated Zechariah as a father would treat his son. John R. and Zechariah loved one another. Theresa could not imagine anyone other than John R. being Zechariah's father.

¶ 25 The State called Truax of Caritas, a witness previously called by the GAL, to testify. Truax testified that John R. had submitted to DNA testing in April 2023.

¶ 26 The court took judicial notice of its order entered on August 25, 2022, directing John R. to submit to DNA testing to determine whether he was the biological father of Zechariah. The VAP regarding Zechariah was admitted into evidence; it was signed by John R., as the father, and Theresa, as the mother, on August 8, 2022, as witnessed, and it was filed on that same date with the HFS.

¶ 27 In closing argument at the hearing on the GAL's petition, the GAL stated that John R. and Theresa had signed the VAP for Zechariah so that John R.—despite not being Zechariah's biological father—would be considered his father to the exclusion of anybody else. The purpose of a VAP is not to avoid the necessity of an adoption proceeding. "[T]here is potentially still a parent out there that has rights that need to be considered," the GAL said. Meanwhile, the State

had "no ability to track down another father unless [Theresa] discloses who that potential father could be." Either John R. and Theresa were trying to perpetrate a fraud upon the court, or there was a material mistake of fact in the execution of the voluntary acknowledgment of paternity.

¶ 28 The attorneys for John R. and Theresa both urged the court to deny the GAL's petition. Both attorneys argued that public policy militated against granting the petition, since doing so would leave Zechariah without a legal father. John R.'s attorney argued that the GAL had failed to prove, by clear and convincing evidence, fraud, duress, or material mistake of fact, as a person challenging a VAP was required to do. Theresa's attorney agreed with this argument. The State agreed with the GAL's argument.

¶ 29 At the end of the May 30, 2024, hearing, the circuit court took the matter of the GAL's petition under advisement. It also gave each party an opportunity to submit either a memorandum of law or a list of case authorities.

¶ 30 Five months later, on October 30, 2024, the circuit court entered an order granting the GAL's petition to declare the nonexistence of a parent-child relationship between John R. and Zechariah. The court found that the GAL had proven, by clear and convincing evidence, that John R. had signed the VAP due to a material mistake of fact, *i.e.*, "the mistaken belief that he was or could have been the father. "In light of that declaration, with the VAP "successfully challenged," the court vacated the VAP.

¶ 31 On October 31, 2024, the circuit court called the case for a previously-scheduled permanency review hearing. The court began by apologizing to the parties for the delay in entering an order on the GAL's petition. "[I]t came down to an issue of whether the child had standing," and the court ultimately concluded that "the child did have standing, that the burden of proof was

met." After proceedings had concluded for the day, the court invited motions to reconsider the court's ruling on the GAL's petition.

¶ 32    On November 21, 2024, Theresa filed, through counsel, a motion to reconsider the order granting the GAL's petition. In her motion, Theresa stated that "rendering [Zechariah] fatherless places an unnecessary burden not only on [Zechariah] but also on [Theresa] who continues to have legal obligations for the child's care." She stated explicitly that "it is not in the best interest of the minor child to be rendered fatherless by this court." She also stated that she had requested to see "any purported test results" showing that John R. was not Zechariah's biological father, but she never had seen any such results, and such results were not produced at the hearing on the GAL's petition. Theresa's attorney "improperly assumed that such test results would be provided at some point in the hearing and failed to timely object to any testimony about such results."

¶ 33    On May 8, 2025, after a hearing, the circuit court denied Theresa's motion to reconsider. The court stated that a motion to reconsider could be based on DNA evidence showing that John R. was Zechariah's father, or on evidence that DNA testing on John R. was not completed, but no such evidence was in the record.

¶ 34    Theresa filed a timely notice of appeal. The circuit court appointed appellate counsel for Theresa.

¶ 35                                II. ANALYSIS

¶ 36    As previously noted, appointed appellate counsel has filed an *Anders* motion and brief, and Theresa has not responded. In her brief, counsel presents three potential issues for review. This court examines each of the three.

¶ 37    The first potential issue raised by appellate counsel in her *Anders* brief is whether Zechariah, through his GAL, had standing to challenge the VAP that had been intended to establish

10

a parent-child relationship between John R. and Zechariah. This issue requires the construction or interpretation of a statute, which presents a question of law; therefore, review is *de novo*. *In re A.A.*, 2015 IL 118605, ¶ 21.

¶ 38    Under section 201(b) of the Illinois Parentage Act of 2015 (Parentage Act), the parent-child relationship may be established between a man and a child in various ways. 750 ILCS 46/201(b) (West 2024). One way is through "an effective voluntary acknowledgment of paternity [or VAP] by the man ***, unless the acknowledgment has been rescinded or successfully challenged." *Id.* § 201(b)(2). Section 301 makes clear that a parent-child relationship "may be established voluntarily by the signing and witnessing of a [VAP]." *Id.* § 301. Section 302(a) gives all the particulars of a valid VAP. *Id.* § 302(a). Section 205(a) of the Parentage Act is of particular relevance to the instant potential issue. Section 205(a) states, in pertinent part: "An action to declare the non-existence of the parent-child relationship may be brought by *the child*, the birth mother, or a person presumed to be a parent ***." (Emphasis added.) *Id.* § 205(a).

¶ 39    In the instant case, Zechariah—the child—brought the action to declare the nonexistence of the parent-child relationship. On March 10, 2023, he filed, through his GAL, a verified petition to declare the nonexistence of a parent-child relationship between John R. and himself. As appellate counsel states in her *Anders* brief, "the plain language of the statute [*i.e.*, of section 205(a)] controls the instant case." There can be no doubt, given the words of section 205(a), that Zechariah had standing to bring the action by filing that petition. No argument to the contrary would have any merit.

¶ 40    The second potential issue raised by appellate counsel is whether the GAL proved by clear and convincing evidence that at the time John R. and Theresa signed the VAP, they were operating

11

under a material mistake of fact that John R. was Zechariah's biological father. Any argument that the GAL did not prove a material mistake of fact is without arguable merit.

¶ 41    A VAP "may be challenged only on the basis of fraud, duress, or material mistake of fact." 750 ILCS 46/309(a) (West 2024). The party who challenges the VAP "shall have the burden of proof." *Id.* § 309(b). "The burden of proof to challenge a [VAP] is clear and convincing evidence." *Id.*

¶ 42    A factual finding by clear and convincing evidence is generally upheld unless it is against the manifest weight of the evidence. *People v. Pitts*, 2024 IL App (1st) 232336, ¶ 21 (the appellate court has "consistently attached a manifest weight of the evidence standard of review" to findings made by the circuit court by clear and convincing evidence). Accordingly, the circuit court's finding of fraud, duress, or material mistake of fact, in a challenge to a VAP, will be overturned only if it is against the manifest weight of the evidence. " 'A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *Id.* ¶ 29 (quoting *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)).

¶ 43    The circuit court's decision that the GAL had proved a material mistake of fact turned on the court's determination of the credibility of witnesses. It is the circuit court's role to determine the credibility of witnesses, and a reviewing court should not interfere with such determinations. *In re D.W.*, 386 Ill. App. 3d 124, 134 (2008).

¶ 44    At the May 30, 2024, hearing on the GAL's petition to declare the nonexistence of a parent-child relationship, John R. testified that at the time he signed the VAP, he truly believed that he was the biological father of Zechariah. In its written order granting the GAL's petition, the circuit court explicitly credited this testimony. The court was free to credit it. Meanwhile, as the court's

12

order stated, "[t]he DNA results and [John R.'s] acknowledgment of them" proved by clear and convincing evidence that John R. was not, in fact, Zechariah's biological father. (The actual DNA results were not made a part of the record, but the trial transcripts sufficiently convey the information. See *In re D.W.*, 386 Ill. App. 3d at 134.) The court reasoned that at the time John R. executed the VAP, he was operating under a material mistake of fact, *i.e.*, "the mistaken belief that he was or could have been the father." Thus, the GAL successfully challenged the VAP on the basis of a material mistake of fact. No argument that the circuit court's decision was against the manifest weight of the evidence would have merit.

¶ 45 The third potential issue raised by appellate counsel is whether the circuit court erred in disestablishing the parent-child relationship between John R. and Zechariah without first considering the best interests of Zechariah. At the May 30, 2024, hearing on the GAL's petition, John R. and Theresa both argued, through counsel, that public-policy considerations militated in favor of denying the petition, since granting the petition would deprive Zechariah of his legal father. Theresa, in her motion to reconsider the court's ruling on the GAL's petition, explicitly stated that "it is not in the best interest of the minor child to be rendered fatherless by this court."

¶ 46 Any argument that the circuit court was required to consider the best interests of Zechariah before ruling on the GAL's petition and vacating the VAP (thus disestablishing the parent-child relationship between John R. and Zechariah) would be meritless. In fact, considering the best interests of Zechariah before ruling on a petition of that sort would not even be permissible under our supreme court's decision in *In re A.A.*, 2015 IL 118605, as appellate counsel recognizes in her *Anders* brief.

¶ 47 *A.A.* was a case wherein the GAL for a minor had filed with the circuit court, on the minor's behalf, a petition to declare the nonexistence of a parent-child relationship between a man who

13

had signed a VAP regarding the minor and the minor himself. *A.A.*, 2015 IL 118605, ¶¶ 1, 12. The GAL's petition was grounded on the fact that DNA test results showed that the man who had signed the VAP was not, in fact, the minor's biological father; the results revealed that the biological father was another man, one who had recently died. *Id.* ¶¶ 7, 9, 12. After a hearing, the circuit court entered an order declaring the nonexistence of a parent-child relationship between the man who had signed the VAP and the minor, based on the DNA test results that established that the other man was the minor's biological father. *Id.* ¶ 16. In light of that declaration, the circuit court vacated the VAP. *Id.*

¶ 48 Before our supreme court, the man who had signed the VAP argued that the circuit court was required to make a best-interests-of-the-child determination before granting the GAL's petition to declare the nonexistence of a parent-child relationship between himself and the minor. *Id.* ¶ 20. Our supreme court rejected this argument. *Id.* ¶ 27. "An action brought under the Parentage Act on behalf of a minor to declare the nonexistence of a parent and child relationship does not provide for the court to consider the best interests of the child prior to granting the petition." *Id.* The court declined to "read into the Parentage Act *** language that is not expressed by the legislature." *Id.* (citing *In re D.L.*, 191 Ill. 2d 1, 9 (2000)). The best-interests standard does not come into play where the evidence clearly shows that the man who signed the VAP is not the biological father of the minor. *Id.* ¶ 29. "[B]efore the best interests standard can be applied to determine a parent's rights to custody, visitation, and support, the party must first be a parent." *Id.* ¶ 17.

¶ 49 *A.A.* was decided under the Parentage Act of 1984, which was repealed in its entirety (see Pub. Act 99-85, § 977 (eff. Jan. 1, 2016)) and replaced by the Parentage Act of 2015 (see Pub. Act 99-85, § 101 (eff. Jan. 1, 2016) (adding 750 ILCS 46/101 *et seq.*)). However, there were no

14

changes between the two Parentage Acts that would alter the reasoning or the result in *A.A.*, or *A.A.*'s applicability to the instant case.

¶ 50    Here, once the GAL proved by clear and convincing evidence that John R. was not Zechariah's biological father, the circuit court had no choice but to grant the GAL's petition and vacate the VAP that John R. had signed. The signing of a VAP did not make John R. Zechariah's biological father. Thus, the clear and convincing standard is applicable here, not the best-interests standard.

¶ 51                                III. CONCLUSION

¶ 52    The three potential issues raised by appellate counsel in her *Anders* brief lack substantial merit. Also, this court's independent examination of the record in this case does not reveal any meritorious issue on appeal. Accordingly, this court grants appellate counsel leave to withdraw and affirms the circuit court's order granting the GAL's petition.

¶ 53    Motion granted; judgment affirmed.